## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TAMARA BLANCHETTE, on behalf of
herself and all others similarly situated,

*Plaintiff*,

v.

ELISABETH DEVOS, *in her official
capacity as Secretary of Education*, and
UNITED STATES DEPARTMENT OF
EDUCATION,

*Defendants*.

Case No. 19-cv- 1775

**CLASS ACTION COMPLAINT**

### INTRODUCTION

1.      Ten years ago, Named Plaintiff Tamara Blanchette, a low-income single mother

and waitress, decided that she wanted to improve her career by becoming a probation officer.  To

achieve this goal, she researched schools online and scheduled a visit at the Minnesota School of

Business ("MSB"), a for-profit institution of higher education, to learn more about its criminal

justice program.

2.      During her December 2008 visit, MSB staff told Ms. Blanchette that its associate

degree in criminal justice would allow her to work as a probation officer in Minnesota and that

its credits would easily transfer to other institutions.  Based on those representations, Ms.

Blanchette enrolled and borrowed thousands of dollars in federal student loans to cover the cost

of her attendance.

3.      Ultimately, Ms. Blanchette was unable to complete her degree at MSB and returned to her job as a waitress.  In 2015, after being unable to afford her monthly student loan payments, Ms. Blanchette defaulted on her federal student loans.

4.      In September 2016, following a multi-week trial, a Minnesota state court found that MSB and its sister school, Globe University ("Globe"), had made false, deceptive, and misleading statements to both enrolled and prospective students, including Ms. Blanchette, about its criminal justice program.

5.      In December 2016, the United States Department of Education ("ED") likewise found that MSB and Globe had misrepresented its criminal justice program, as well as the transferability of its credits to other institutions.  As a result, ED stripped MSB and Globe of their eligibility to participate in federal student aid programs under Title IV of the Higher Education Act ("HEA") (hereinafter, the "recertification denial"), causing the schools to close.

6.      Pursuant to the terms of Ms. Blanchette's Master Promissory Note ("MPN") and applicable law and regulations, she and the proposed class have a defense against repayment that renders their federal student loan debt unenforceable.

7.      Secretary of Education Elisabeth DeVos and ED (collectively, the "Defendants") nevertheless subjected Ms. Blanchette and the proposed class to involuntary collection efforts through the Bureau of the Fiscal Service's ("Fiscal Service") Treasury Offset Program ("TOP") and administrative wage garnishment ("AWG").

8.      Ms. Blanchette brings this lawsuit under the Administrative Procedure Act ("APA") and Due Process Clause on behalf of herself and all other individuals who: (i) took out federal student loans to attend MSB and Globe based on the schools' misrepresentations about its criminal justice program and the transferability of its credits; (ii) testified or submitted sworn

2

affidavits in the Minnesota state trial about their reliance on those misrepresentations; and (iii) have been subjected to involuntary collection efforts by Defendants.

9.      Ms. Blanchette asks this Court to find that the Defendants violated the APA by: (i) certifying and re-certifying the legal enforceability of the proposed class of MSB and Globe borrowers' defaulted student loan debt, even though Defendants knew about the legal bar to the collection of those loans resulting from MSB's and Globe's illegal misconduct; (ii) actually offsetting these borrowers' debts by seizing their tax refunds and other federal benefits; and/or (iii) issuing a wage garnishment or withholding order.  Ms. Blanchette also seeks to halt the further certification or garnishment of the proposed class's defaulted student loan debt, as well as to recoup amounts previously seized.

## JURISDICTION AND VENUE

10.      This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the APA, 5 U.S.C. §§ 701-706, the HEA, 20 U.S.C. § 1082, the Debt Collection Improvement Act, 31 U.S.C. § 3701, and the Due Process Clause of the Fifth Amendment, U.S. Const. amend. V.  The Court also has the authority to order a remedy pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

11.      Because this is an action against an officer and agency of the United States, venue is proper in this district pursuant to 28 U.S.C. § 1391(e).  Venue is also proper in this district because Secretary DeVos performs her official duties here.  Finally, many of the events giving rise to this action took place here.

## PARTIES

12.      Plaintiff Tamara Blanchette is a natural person who resides in Minneapolis, Minnesota.

13.     Defendant Elisabeth DeVos is the Secretary of Education.  In her official capacity, the Secretary of Education oversees all operations of the Department of Education and the administration of federal student loans, including the Federal Family Education Loan ("FFEL") and Direct Loan programs.  She has the ultimate duty and power to collect, discharge, cancel, settle, or compromise federal student loans.  In this capacity, the Secretary of Education may place a loan into defaulted status, report that default to all three major credit bureaus, certify and refer that debt to Treasury for payment by offset, and issue a wage garnishment order.

14.     Defendant ED is a department of the executive branch of the United States government headquartered in Washington, D.C. and an agency of the United States within the meaning of 5 U.S.C. § 552(f)(1).

## ALLEGATIONS COMMON TO THE CLASS

### *Defaulting on Federal Student Loan Debt*

15.     Pursuant to the HEA, borrowers who fail to make their scheduled payments for a period of at least 270 days are considered to be in default on their federal student loans.  20 U.S.C. § 1085(l).

16.     Once a borrower defaults, the consequences are severe.

17.     The entire unpaid balance of the borrower's loan, including interest, immediately becomes due.  The interest is also capitalized, which increases the principal balance of the loan.

18.     A borrower can also be held responsible for any court costs, collection fees, and attorney's fees associated with the defaulted student loan debt.  These costs and fees can add as much as twenty-five percent to the balance of Direct and FFEL loans.

19.     A borrower in default also loses his or her eligibility to receive additional federal student aid (including Pell grants), which may prevent the borrower from returning to school.

20.     In addition, the HEA requires the Secretary of Education to report the borrower's default to all three major credit bureaus, 20 U.S.C. § 1080a(a),[1] after first verifying "its accuracy and completeness," *id.* § 1080a(c).[2]

21.     According to the terms of the Borrower's Rights and Responsibilities Statement, which is included with every Master Promissory Note, ED must provide at least thirty days' notice to a borrower before reporting the default information to credit bureaus.[3]  This allows the borrower to dispute the debt before it is reported.

22.     Once reported, a borrower's default remains on her credit report for at least seven years.  20 U.S.C. § 1080a(f).

23.     Defaults can damage borrowers' credit by lowering their overall credit scores.  As a result, defaults can make it more difficult for borrowers to buy a car or house, pay insurance premiums, open a bank account, get a credit card or other line of credit, or obtain certain jobs.

24.     There are three ways a borrower can get out of default: repayment in full, loan consolidation, or loan rehabilitation.  Each option can only be used once.

25.     As relevant here, loan rehabilitation involves a written agreement between the borrower and loan holder to make nine voluntary, reasonable, and affordable monthly payments within twenty days of the due date over a period of ten consecutive months.  Once made, the

---

[1]     The HEA makes clear that borrowers of Direct loans will have the "same terms, conditions, and benefits" as borrowers of FFEL loans.  20 U.S.C. § 1087e(a)(1).

[2]     *See also* Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(a)(1) (prohibiting the reporting of consumer information that a person "knows or has reasonable cause to believe" is inaccurate).

[3]     *See* U.S. Dep't of Educ., Master Promissory Note, William D. Ford Federal Direct Loan Program, Direct Subsidized and Direct Unsubsidized Loans Borrower's Rights and Responsibilities Statement, OMB No. 1845-0007, at 12, *available at:* https://ifap.ed.gov/dlfsheets/attachments/DLSubUnsubMPNnodatalabels.pdf ("Direct Loan MPN"); *see also* U.S. Dep't of Educ., Federal Family Education Loan Program (FFELP), Federal Stafford Loan, Master Promissory Note, Borrower's Rights and Responsibilities, OMB No. 1845-0006, at *7, *available at:* https://ifap.ed.gov/dpcletters/attachments/FP0608StaffApp2008.pdf ("FFEL Loan MPN").

borrower's loans will no longer be in default, the record of default will be removed from the

borrower's credit history (but the late payments that led to the default will remain), collection of

payments through wage garnishment or Treasury offset will stop, and the borrower's eligibility

for federal student aid will be restored.

### *ED's Extrajudicial Collection Powers*

26.     As part of its management of the federal student loan program, ED possesses

extensive extrajudicial collection powers, including the power to seize federal student borrowers'

tax refunds or other federal benefits and garnish their wages without a court order.  *See* 31

U.S.C. § 3716; 31 U.S.C. § 3720A; 31 U.S.C. § 3720D.  ED can choose to pursue these different

collection methods separately or simultaneously.

27.     Like other federal agencies, ED relies on Treasury's Fiscal Service to effectuate

offsets in order to secure payment for debts owed.

28.     In fiscal year 2017, for example, Treasury collected over $14 billion in debt owed

to ED.

29.     The Debt Collection Improvement Act ("DCIA") governs the collection of all

debts owed to the United States, including through the Fiscal Service's TOP.

30.     Under the DCIA, before submitting a debt to Treasury, ED must first comply with

certain notice requirements to the borrower.  *See* 31 U.S.C. §§ 3716, 3720A(b)(3); 31 C.F.R.

§ 285.2(d); 34 C.F.R. § 30.33.  Once it has provided this notice, ED must then certify only those

debts that it determines are legally enforceable.  *Id.*

31.     In other words, prior to certifying a debt to Treasury for offset, ED must make a

final determination of legal enforceability, which includes certification that the debt is due, in the

amount stated, with no legal bars to collection. 31 U.S.C. § 3720A(b); 31 C.F.R.

§§ 285.2(d)(1)(i), 285.5(b), (d)(3).

32.     One possible legal bar to collection includes a borrower's defense against repayment. Pursuant to the terms of the MPN, a student loan borrower has a defense against repayment whenever the "school did something wrong or failed to do something that it should have done."[4] Federal regulations also allow a borrower to assert a defense against repayment whenever the school commits an act or omission relating to the making of a loan (or the provision of educational services for which the loan was provided) that would give rise to a cause of action under state law. 34 C.F.R. § 685.206(c)(1); *see also* 20 U.S.C. § 1087e(h).[5]

33.     If ED determines that the borrower's student loan debt is legally enforceable and proceeds to certify that debt to the Secretary of Treasury, Treasury's Fiscal Service will offset the borrower's tax refund or other federal benefits to satisfy the debt in question. 31 C.F.R. § 285.2(b)(2).

34.     Once it has done so, the Fiscal Service will then inform the debtor of the offset. 31 C.F.R. § 285.2(e). This will be the second notice that the borrower receives.

35.     After the Secretary of Education has notified a debtor of her initial intent to offset a debt, the Secretary of Education may also offset future years' tax refunds without providing the debtor with any additional notice. 34 C.F.R. §§ 30.22(d), 30.33(a).

---

[4]     *See* Direct Loan MPN at 13; FFEL Loan MPN at *2.

[5]     Federal regulations governing FFEL loans also dictate that "[a]ny lender holding a loan is subject to all claims and defenses that the borrower could assert against the school with respect to that loan," so long as the borrower can establish that there was a sufficiently close relationship between the school and the lender. See 34 C.F.R. § 682.209(g). This provision of the FFEL regulations reflects the Department of Education's adoption of the Federal Trade Commission's Preservation of Consumers' Claims and Defenses regulation, commonly referred to as the "Holder Rule." *See* 16 C.F.R. §§ 433.1-433.2.

36.     In order to effectuate future offsets, however, the Secretary of Education must re-certify the debt to Treasury's Fiscal Service every year.  This re-certification must include a new final agency determination that the debt continues to be legally enforceable.  31 C.F.R. § 285.5(d)(3)(i)(B), (d)(7)(i).

37.     Moreover, the Secretary of Education has an ongoing obligation to immediately notify the Fiscal Service of any change in status to the legal enforceability of a debt.  31 C.F.R. §§ 285.2(d)(4), (d)(10)(iv).

38.     The Secretary of Education may also choose to garnish a borrower's wages as a means of collecting defaulted student loan debt.  20 U.S.C. § 1095a; 31 U.S.C. § 3720D(a).  The Secretary of Education may only do so, however, if she follows certain procedures.  *See* 20 U.S.C. § 1095a(a); 31 U.S.C. § 3720D(b).

39.     Pursuant to the Department's regulations, at least thirty days prior to issuing any garnishment order, ED must provide written notice of its intent to garnish to the borrower via first class mail.  34 C.F.R. § 34.4.  This notice must include the nature and amount of the debt, *id.* § 34.5, and an explanation of the borrower's rights and applicable deadlines, *id.* § 34.6.

40.     ED must offer an opportunity for a hearing to any borrower who objects regarding "the existence, amount, or current enforceability of the debt.**"**  34 C.F.R. § 34.6; *see also* 20 U.S.C. § 1095a(a)(5).  The hearing official's decision is a final agency action under the APA.  34 C.F.R. § 34.17.

41.     Within thirty days of the hearing official's decision—or, alternatively, within thirty days of the borrower's failure to timely request a hearing—ED will issue a garnishment order directly to the borrower's employer.  34 C.F.R. § 34.18.  The Secretary of Education has

the right to take legal action against an employer in order to enforce that order.  20 U.S.C.

§ 1095a(a)(6).

42.      Once issued, a garnishment or withholding order remains in effect until the

Secretary of Education rescinds the order or the debt is fully paid, including interest, penalties,

and collection costs.  34 C.F.R. § 34.26.  Such an order also qualifies as a final agency action

under the APA.

### *MSB and Globe*

43.      MSB is a for-profit institution of higher education with its principal place of

business in Woodbury, Minnesota.  As recently as 2016, MSB operated campuses in Blaine,

Brooklyn Center, Elk River, Lakeville, Moorhead, Plymouth, Richfield, Rochester, Shakopee,

and St. Cloud, Minnesota.  MSB also enrolled Minnesota students in the MSB-Online Division

from Richfield, Minnesota.

44.      Globe—MSB's sister school—is also a for-profit institution of higher education

with its principal place of business in Woodbury, Minnesota.  As recently as 2016, Globe

operated two campuses in Minneapolis and Woodbury, Minnesota; a campus in Sioux Falls,

South Dakota; campuses at seven Wisconsin locations; and an online program.

45.      MSB and Globe are jointly operated by the same management team, share certain

resources, and are owned by the same family.  *See Minnesota v. Minnesota Sch. of Business,*

*Inc.*, No. 27-cv-14-12558, 2016 WL 9709976, at *2–*3 (Minn. Dist. Ct. Sept. 8, 2016) (Trial

Order) ("*MSB*").  In addition, MSB and Globe "h[o]ld themselves out to the public as separately

titled, but factually indistinguishable entities."  *Id.* at *47.

46.     From 2009 to 2015, MSB and Globe collectively enrolled approximately 28,000 students at their Minnesota campuses (including the online division located in Richfield, Minnesota).  More than 14,000 students graduated during that time period.

47.     As of September 2016, close to 3,000 students were still enrolled at either MSB or Globe.  Approximately 1,300 of those students were pursuing degrees in criminal justice.

48.     As described in greater detail below, both MSB and Globe defrauded numerous students, misconduct for which they were ultimately found jointly liable.  *MSB*, 2016 WL 9709976, at *47.

### *ED's Knowledge of MSB's and Globe's Fraud*

49.     The Department of Education has known since at least December 2016 that MSB and Globe violated Minnesota state law by misrepresenting its educational services to prospective and current students.

50.     This knowledge is based on the Findings of Fact, Conclusions of Law, and Order by the District Court for the Fourth Judicial District in Hennepin County, Minnesota (the "Minnesota District Court") and the Department of Education's own recertification denials, which ended MSB's and Globe's participation in Title IV programs.

### *The Minnesota District Court Finds that MSB and Globe Defrauded Numerous Students*

51.     On September 8, 2016, following a multi-week trial, the Minnesota District Court held that MSB and Globe violated the state's Consumer Fraud Act ("CFA") and Deceptive Trade Practices Act ("DTPA") when the schools "advertis[ed] and market[ed] their criminal justice program as providing all or some portion of the education and training necessary to become a Minnesota police officer."  *MSB*, 2016 WL 9709976, at *48.  The Minnesota District Court further explained that:

> Defendants' program was not in fact certified by the POST board to permit a graduate to become a police officer, nor was it a regionally-accredited program that permitted its graduates to attend a . . . "skills training" course to become a licensed Minnesota police officer.  Yet, Defendants targeted their criminal justice program to students interested in careers as Minnesota police officers; advertised that their program could make graduates eligible to become police officers or participate in additional training to do so; had recruiters recommend the program to students who expressed an interest in becoming police officers in Minnesota; and told prospective students that they could become police officers or would only need "additional training" to become police officers.  These representations were false and misleading and in violation of the CFA and DTPA.

*Id.*

52.    The Minnesota District Court also concluded that MSB and Globe violated both the state's CFA and DTPA when the schools:

> [M]arket[ed] their criminal-justice [sic] associate's [sic] degree program as a means for becoming a probation officer in Minnesota. . . . [P]robation officer jobs in Minnesota at a minimum require a bachelors [sic] degree, and Defendants knew this.  Yet, Defendants advertised and recommended their criminal justice associate's [sic] degree program as a means for students to become probation officers.

*Id.* at *49.

53.    Finally, the Minnesota District Court made factual findings about specific MSB and Globe students who were misled by the schools, including Named Plaintiff Tamara Blanchette.  *See generally, MSB*, 2016 WL 9709976, at *18–*40.

54.    On December 14, 2016, ED confirmed to former Minnesota Attorney General Lori Swanson that it had received a copy of the Minnesota District Court's September 2016 Trial Order.  *See* Exhibit A, Minnesota Attorney General Lori Swanson Letter to ED at 1.

### ED Issues Findings Confirming and Expanding Upon the Minnesota District Court Order

55.    On December 6, 2016, ED issued recertification denials for both Globe and MSB, ending their participation in federal student aid under Title IV.  *See generally* Exhibit B, MSB Recertification Denial; Exhibit C, Globe Recertification Denial.  ED provided, *inter alia*, two bases for this decision.

56.     First, ED's recertification denials specifically refer to the Minnesota District Court's Trial Order as a "judicial determination" that both schools had "committed fraud involving Title IV program funds." Exh. B at 2; Exh. C at 3.  Such a determination makes an institution ineligible for further participation in Title IV.  *See* 20 U.S.C. § 1002(a)(4)(B); 34 C.F.R. § 600.7(a)(3)(ii).

57.     Second, the recertification denials explain that, as part of MSB's and Globe's Program Participation Agreements ("PPA") under the HEA, each institution had agreed to comply with all Title IV requirements,[6] including the prohibition on making "substantial misrepresentation[s] about the nature of its educational program, its financial charges, or the employability of its graduates."  *See* 34 C.F.R. § 668.71.

58.     Because MSB and Globe had "made substantial misrepresentations about the nature of its criminal justice program and the employability of the graduates of that program," as well as "[their] students' ability to transfer credits . . . to other institutions," Exh. B at 2; Exh. C at 2, both schools violated at least three Title IV, HEA program requirements,[7] including, most critically, ED's prohibition on substantial misrepresentations "in all forms."  Exh. B at 4; Exh. C at 4.

59.     More specifically, ED found that MSB and Globe "substantially misrepresented to students and prospective students the ability of graduates of MSB's [and Globe's] criminal justice program[s] to become police officers and probation officers in the state of Minnesota. . . . Here, MSB [and Globe] affirmatively misrepresented Minnesota's licensing requirements for

---

[6]     *See generally* 20 U.S.C. § 1094(a)(1); 34 C.F.R. § 668.14(b)(1) (requiring institutions that participate in the Title IV program under the HEA to "comply with all statutory provisions of or applicable to Title IV of the HEA" as well as "all applicable regulatory provisions prescribed under that statutory authority").

[7]     The other two Title IV, HEA program requirements that MSB and Globe violated include: (i) fiduciary duty and (ii) administrative capability.  *Id.* at 4.

police and probation." Exh. B at 5; Exh. C at 5. These misrepresentations took place from 2009 until 2014.

60.     In addition, ED found that:

[B]lanket statements MSB [and Globe] made to prospective students conflating national and regional accreditation . . . constitute substantial misrepresentations. Likewise, some of the substantial misrepresentations at issue were made to prospective students who informed MSB [and Globe] that they were interested in transferring credits earned at MSB [or Globe] to an institution within the University of Minnesota or within the Minnesota State Colleges and University system. All of those institutions are accredited by the Higher Learning Commission, a regional accreditor, and MSB's [and Globe's] credits did not transfer. In addition, in some cases, the prospective student asked MSB [or Globe] about the transferability of MSB's credits to a particular institution, and MSB [or Globe] misrepresented the transferability of [its] credits to that institution.

Exh. B at 11-12; Exh. C at 11-12. These misrepresentations took place from 2007 until 2014 and affected students "at each campus" in a broad range of programs of study. Exh. B at 11; Exh. C at 11.

61.     The Department of Education explicitly incorporated in its recertification denials the Minnesota District Court's factual findings about MSB's and Globe's misrepresentations to specific students who testified or submitted sworn affidavits, including Named Plaintiff Tamara Blanchette. *See* Exh. B at 3 n.2; Exh. C at 3 n.2.

## FACTUAL ALLEGATIONS CONCERNING NAMED PLAINTIFF

### *Ms. Blanchette's Enrollment at MSB*

62.     Ms. Blanchette attended MSB, located at 3680 Pheasant Ridge Drive NE, Blaine, MN 55449, from approximately January 2009 until May 2011, where she was enrolled in its criminal justice associate degree program.

63.     Ms. Blanchette borrowed $15,500 in FFEL loans and $8,000 in Direct loans to pay for her attendance at MSB.

64.     As explained by the Minnesota District Court, Ms. Blanchette wanted to pursue a career as a probation officer.  *MSB*, 2016 WL 9709976, at *36.  To explore this career option, Ms. Blanchette searched the internet and learned that MSB offered a criminal justice program. *Id.*  She scheduled a visit with admissions representative Brian Saintey to learn more about the program and see "if it was a good fit for [her]."  *Id.*

65.     During her visit on December 16, 2008, MSB made numerous representations to Ms. Blanchette.

66.     First, when Ms. Blanchette told Mr. Saintey that she wanted to enroll at MSB in order to become a probation officer, he "responded by telling her she had made a 'good choice' and that her career goal was something MSB 'could help [her] with.'" *Id.*  He then "recommended that Ms. Blanchette complete MSB's criminal justice associate degree program[] and assured her that upon her graduation from the two-year program she could begin her career as a probation officer." *Id.*[8]  At the time, MSB did not even offer a bachelor's degree in criminal justice. *Id.*  Because Minnesota requires probation officers to have at least a bachelor's degree, the Minnesota District Court found that MSB's statements to Ms. Blanchette were false, deceptive, and misleading.

67.     Second, Ms. Blanchette told Mr. Saintey during her December 2008 visit that credit transferability was "a big deal for [her]," as she planned "to obtain an associate's [sic] degree at MSB, gain some work experience, and then attend a different college to earn a higher degree." *Id.* at *37.  Mr. Saintey falsely stated that transferring her credits would "not be a problem for her" since MSB credits transferred to other institutions. *Id.*  ED found in its

---

[8]     *Id.* ("Defendants' own records confirm that Ms. Blanchette told admission representative Saintey that she was 'very interested' in becoming a probation or parole officer" and that Mr. Sainety recommended that she "enroll in Defendants' criminal justice associate's [sic] degree program.").

recertification denials that MSB's statements about the transferability of its credits were a substantial misrepresentation.

68.     Due to life circumstances unrelated to this case, including her daughter's drug addiction and attempted suicide, Ms. Blanchette struggled with her studies.  *Id.* at *37.  She attempted to secure accommodations from MSB that would allow her to help her daughter and return to her studies at a later date, but was ultimately unsuccessful in doing so.  She left MSB shortly thereafter.

69.     After leaving MSB, Ms. Blanchette resumed working as a waitress and bartender. She struggled to make ends meet and could not afford her monthly student loan payments.  As a result, Ms. Blanchette defaulted on all seven of the federal student loans she took out to attend MSB.

70.     On or about March 8, 2015, the Secretary of Education sent information about Ms. Blanchette's default to all three major credit bureaus.

### Defendants Offset Ms. Blanchette's Tax Refund Despite Knowing About a Legal Bar to the Collection of her Defaulted Student Loans

71.     Upon information and belief, on a date known to the Secretary of Education, the Department of Education sent a Notice of Proposed Treasury Offset to Ms. Blanchette.  This notice referred to her defaulted student loan debt as "legally enforceable" and provided her with the options of either repaying the debt in full or entering into a "satisfactory" repayment agreement.  This notice did not specifically alert Ms. Blanchette to the fact that she could dispute the proposed offset by raising a defense against repayment.

72.     Given Ms. Blanchette's low income and lack of discretionary funds, she was unable to hire legal counsel to help her interpret the notice or challenge the Defendants' proposed offset.

73.     Upon information and belief, on a date known to the Secretary of Education, the Department of Education certified Ms. Blanchette's debt as legally enforceable and referred her student loan debt to the Fiscal Service for tax offset.

74.     Upon information and belief, on several dates known to the Secretary of Treasury, the Fiscal Service offset Ms. Blanchette's tax refunds for payment of her student loan debt.  In 2018, for example, TOP seized at least $1,906 of Ms. Blanchette's 2017 state tax refund.

75.     ED continued to certify Ms. Blanchette's MSB-related student loan debt for offset despite actual knowledge from the Minnesota District Court Trial Order and its own findings that her loans were not legally enforceable.

76.     As of May 2019, Ms. Blanchette successfully rehabilitated her defaulted student loans.  As a result, ED is legally obligated to withdraw its certification of her student loan debt for tax refund offset.

77.     Given Ms. Blanchette's financial resources, she may default on her student loans again in the future.  If she does, and ED certifies her defaulted loans for offset, she will not be able to get out of default through loan rehabilitation a second time.  Thus, she will have fewer options to stop the seizure of her tax refunds, making the consequences of default more severe.

78.     According to the National Student Loan Data System, as of January 2019, the federal student loan balance attributable to loans Ms. Blanchette took out to attend MSB is approximately $29,418.  ED has also charged Ms. Blanchette an additional $5,891.47 in collection fees and costs.

## CLASS ACTION ALLEGATIONS

79.     Named Plaintiff Tamara Blanchette files this class action on behalf of herself and all other individuals who are similarly situated.  She seeks to represent a class consisting of:

All individuals who: (i) borrowed federal student loans to attend MSB or Globe based on the schools' misrepresentations of either its criminal justice program or the transferability of its credits to other institutions or both; (ii) testified or submitted sworn affidavits in the Minnesota state trial about their reliance on those misrepresentations; and (iii) have been or will be subjected to ED's coercive collection efforts through either TOP, AWG, or both.

80.    The proposed class satisfies the requirements of Rule 23(a) of the Federal Rules of Civil Procedure.

81.    The class is so numerous that joinder of all members is impracticable.  Fifteen students testified during trial, while an additional 179 students submitted sworn affidavits.  Some members of the proposed class have already been subjected to coercive collection efforts by the Defendants, while other members of the group may be subjected to similar collection efforts in the future.  The exact number of class members can be determined easily using Defendants' records.

82.    The nature of relief sought, as well as questions of fact and law, are common to all members of the class.  The common questions of law and fact also predominate over any questions affecting individual members of the class.

83.    All members of the proposed class have been subjected to MSB's and Globe's misrepresentations about its criminal justice program, the transferability of its credits, or both.

84.    The common questions of law and fact include, but are not limited to:

    a.    Whether ED's final agency determination that defaulted student loan debt from the proposed class of MSB and Globe borrowers is legally enforceable violates the APA;

    b.    Whether ED's certification and re-certification of, and failure to withdraw the existing certifications of, defaulted student loan debt from the proposed class of MSB and Globe borrowers for offset violates the APA;

c.  Whether ED's wage garnishment of defaulted student loan debt from the

proposed class of MSB and Globe borrowers violates the APA; *and*

d.  Whether the Department's pre-deprivation notice to the proposed class of

MSB and Globe borrowers about involuntary collection violated their due

process rights under the United States Constitution.

85.  The claims of Named Plaintiff Tamara Blanchette are typical of the claims of the

proposed class.  Each member borrowed federal student loans to attend MSB or Globe.  Ms.

Blanchette, like members of the proposed class, relied upon MSB's and Globe's

misrepresentations about the schools' criminal justice programs and the transferability of credits.

She, along with members of the proposed class, has been harmed by the Department's unlawful,

unreasonable, and arbitrary decision that her defaulted student loan debt is legally enforceable

and thus subject to involuntary collection, including through tax refund offset or wage

garnishment.

86.  Named Plaintiff Tamara Blanchette is also an adequate representative of the

proposed class.  Her interests do not conflict with the interests of the class she seeks to represent.

She intends to prosecute this action vigorously.  In addition, Ms. Blanchette has retained counsel

who are competent and experienced in APA, complex consumer protection, and class action

litigation.  She is represented by National Student Legal Defense Network ("NSLDN").  NSLDN

counsel have extensive knowledge of higher education law, consumer protection, and student

debt.  The interests of the proposed class will be adequately protected by Ms. Blanchette and her

attorneys.

87.  A class action is superior for the fair and efficient adjudication of this matter.

Defendants have acted in the same unlawful manner with all class members.  A legal ruling

concerning the unlawfulness of Defendants' actions under the APA and United States

Constitution would vindicate the rights of every class member.  Finally, a class action would

serve the economies of time, effort, and expense while preventing inconsistent results.

## CAUSES OF ACTION

### *Count One: Unlawful Agency Action Under the Administrative Procedure Act*

88.     Named Plaintiff repeats the allegations in the foregoing paragraphs and

incorporates them as though fully set forth herein.

89.     Named Plaintiff seeks a determination that Secretary DeVos and ED violated the

APA by making an improper final agency determination, or failing to make a required final

agency determination, that her student loan debt—and that of the proposed class—was legally

enforceable and, thus, could be collected through offset or wage garnishment.

90.     First, Secretary DeVos' and ED's certification of Named Plaintiff's and the

proposed class's debt for offset was required to include a final agency determination that the

debt, in the amount stated, was due and that there were no legal bars to collection.

91.     In light of ED's actual knowledge of MSB's and Globe's illegal misconduct and

the legal bar to enforcement of Named Plaintiff's and the proposed class's debt created by this

misconduct, Secretary DeVos' and ED's final agency determination that Named Plaintiff's and

the proposed class's student loan debt was legally enforceable is arbitrary and capricious, in

violation of the APA, as well as in violation of Secretary DeVos' statutory duties under the

DCIA.  In the alternative, Secretary DeVos' and ED's failure to make the required final agency

determination prior to certifying Named Plaintiff's and the proposed class's debt for offset is in

violation of the APA and DCIA.

92.     Second, Secretary DeVos' and ED's determination that Named Plaintiff's and the proposed class's student loan debt is legally enforceable and thus subject to collection through wage garnishment is also arbitrary and capricious in violation of the APA and DCIA.

### Count Two: Due Process Violation Under the Fifth Amendment to the United States Constitution

93.     Named Plaintiff repeats the allegations in the foregoing paragraphs and incorporates them as though fully set forth herein.

94.     The Fifth Amendment provides: "No person shall . . . be deprived of life, liberty, or property, without due process of law."  Due process requires that, at a minimum, individuals receive notice and an opportunity to be heard before they are deprived of property.

95.     Named Plaintiff and the proposed class have a constitutionally protected property interest in their tax refunds, other federal benefits, and wages.

96.     Named Plaintiff and the proposed class were each deprived of that property interest when Secretary DeVos and ED certified and re-certified their defaulted student loan debt to Treasury's Fiscal Service for offset without first providing any pre-deprivation notice about: (i) the possibility of challenging the offset by asserting a defense against repayment; (ii) the fact that Named Plaintiff's and the proposed class's debt were not legally enforceable, given MSB's and Globe's illegal misconduct; and (iii) Secretary Devos' general authority to compromise, cancel, or settle student loan debt.

### PRAYER FOR RELIEF

WHEREFORE, Named Plaintiff respectfully requests that this Court:

A.     Certify the class as defined in paragraph 79 pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Enter a declaratory judgment, pursuant to 28 U.S.C. § 2201, that class members' student loan debt from MSB and Globe is not legally enforceable;

C.      Further declare that the certification of class members' student loan debt for offset is unlawful under the DCIA:

D.      Further declare that the Department of Education is obligated to stop certifying and recertifying, and withdraw the existing certifications of, class members' student loan debt for offset;

E.      Further declare that class members' student loan debt cannot be collected through administrative wage garnishment;

F.      Strike ED's final determination that class members' debts are legally enforceable as arbitrary and capricious, unlawful, and/or short of a mandatory duty, in violation of the APA and the DCIA;

G.      Order ancillary relief under 28 U.S.C. § 2202, including a refund of any amounts already seized from class members pursuant to offset or garnishment;

H.      Retain jurisdiction of this matter until Defendants have fulfilled their legal and Court-ordered obligations, as set forth in this Complaint and any subsequent orders of this Court;

I.      Award Plaintiff reasonable fees, expenses, costs, and disbursements, including attorneys' fees associated with this litigation under the Equal Access to Justice Act, 28 U.S.C. § 2412; *and*

J.      Grant such further relief as the Court may deem just and proper.


Respectfully Submitted,

/s/ Robyn K. Bitner

ROBYN K. BITNER, Counsel
D.C. Bar No. 1617036

ALEXANDER S. ELSON, Senior Counsel
D.C. Bar No. 1602459

ERIC ROTHSCHILD, Senior Counsel
D.C. Bar No. 1048877

National Student Legal Defense Network
1015 15th Street N.W., Suite 600
Washington, D.C. 20005
robyn@nsldn.org
alex@nsldn.org
eric@nsldn.org
(202) 734-7495


*Counsel for Named Plaintiff Tamara Blanchette*

Dated: June 18, 2019